LUDWIG NELSON, ADMINISTRATOR, *vs.* THE BRANFORD
LIGHTING AND WATER COMPANY.

Third Judicial District, New Haven, January Term, 1903.
TORRANCE, C. J., BALDWIN, HAMERSLEY, HALL and PRENTICE, Js.

An electric light company is bound to exercise a very high degree of
care in using a highway bridge for its own purposes ; and in deter-
mining what precautions are reasonably necessary it is bound to
consider all the uses to which the bridge is customarily put.

If boys are accustomed to use it as a bathing place and diving stage,
with the knowledge of and without objection from the municipal
authorities in charge of the bridge, the electric wires must be
strung over or across it with reasonable regard to their safety.

A boy of sixteen is not necessarily chargeable with knowledge of the
different modes of insulating electric wires, and their comparative
effects.

In an action for negligence causing death, the only proof on the point
of damages was that the intestate was a bright, active, intelligent
boy of sixteen, five feet and two inches high, who for three years
had been a general clerk in a village grocery store. *Held* that this
was not insufficient to uphold a judgment for $5,000, as it would be
presumed that the court found that his net earnings annually, after
he would have come of age, would have exceeded the amount of the
interest which could probably be obtained during the same period
on that sum, and that due allowance was made for the anticipa-
tion of these earnings by force of a judgment immediately payable.

Courts may take judicial notice of the probabilities disclosed by mor-
tality tables.

When the evidence and rulings of the trial court are made part of the
record, this court is authorized, under § 797 of the General Statutes
of 1902, to examine the entire record for the purpose of determin-
ing whether the appellant is injured by the exclusion of a particu-
lar question.

In an action for negligence in stringing electric wires over a highway
bridge, whereby the plaintiff's intestate was injured, the defend-
ant's superintendent, having testified that the cross-arm on the
pole nearest the point where the injury was suffered was fifteen
feet lower than the cross-arm on the pole standing next in line, and
that this was done to lessen the strain on the first-mentioned pole,
was asked on cross-examination what it would cost to put in an in-
termediate pole for the purpose of elevating the wire across the
draw. *Held* that this was proper cross-examination, as in deter-
mining the reasonable limits within which the defendant was

bound to guard this place, the expense of adopting another mode of stringing the wires was a legitimate subject of consideration.

An expert who examined the line some months after the accident was asked, as a preliminary to showing by him that it was properly constructed at the time of the accident, to describe it as it was when he saw it. *Held* that it was within the discretion of the court to exclude this question as too remote.

Argued January 27th—decided March 4th, 1903.

ACTION by an administrator for damages for negligence causing the death of his intestate, brought to the Superior Court for New Haven County and defaulted; hearing in damages to the court (*Thayer, J.*) and judgment for $5,000, from which defendant appealed. *No error.*

The case is sufficiently stated in the opinion.

*Seymour C. Loomis* and *Earnest C. Simpson*, for the appellant (defendant).

*Charles S. Hamilton*, for the appellee (plaintiff).

BALDWIN, J.    In 1887 the town of Branford built a high-way bridge over Branford River, with a draw.   It was a truss bridge, with a railing on each side.   On the westerly side of it, outside the railing, was a platform with steps leading down to a small landing for boats, which was eight feet below the roadway.   Ever since the construction of this bridge, the boys and young men in the neighborhood had been, with the knowledge of the selectmen, in the custom of bathing from it, in summer, and, while so doing, of running and exercising themselves upon and jumping and diving from all parts of the bridge and draw ; the smaller boys confining themselves to the landing, platform, and floor, but the larger ones diving and jumping from the railings and trusses.

In 1896 the defendant constructed a line of wires for electric lighting purposes along the highway, and bolted one of its poles to the piles of the bridge at each side of the draw.   An iron pipe was attached to each pole, through which the wires were carried down to the bottom of the river and across the bottom. In the summer of 1900, in lieu of this arrangement of the

wires, overhead wires were strung between these poles, which could be detached and removed whenever a vessel passed through the draw. These ran over fourteen feet above the floor of the bridge, and that nearest the west edge of it was about five feet five inches above the peak of the truss, and seventeen inches west of its west face.

The selectmen inspected the defendant's line in 1896, and approved it. They were not consulted as to the change of construction made in 1900, and it did not appear that they approved it. The use of the bridge for bathing purposes continued thereafter as before, with their knowledge and that of the defendant.

The wires above the draw were insulated so as to protect them against the weather, but not so as to make personal contact with them safe. The current was turned on every day towards dark and then they were dangerous to handle. No notice of such danger was given by the defendant, although it knew that the bridge had so much iron in and upon it as to be a good conductor of electricity, and that the current was liable to diversion, if one standing on the bridge should touch the wire overhead, particularly if he were wet at the time.

In July, 1901, at about a quarter before seven in the evening, the plaintiff's intestate, a boy of sixteen, who had been in the water while bathing from the bridge, walked up the west truss, clothed only in bathing trunks, to the peak, which was over seventeen feet above the river, and asked some boys below if they thought he would touch bottom if he dove from there. He then faced about to the west, and,—whether voluntarily or instinctively to prevent a fall did not appear— caught hold of the nearest of the overhead wires, and was killed almost instantaneously by an electric shock. He knew that the wire was an electric light wire, and that a boy had received a shock a year before, while climbing the nearest of the poles for the purpose of diving, but it did not appear that he knew that the wires were dangerous to handle.

The Superior Court has found that the defendant failed to prove that it was not negligent in running the overhead wire as it did, with no greater precautions against danger to

bathers, and failed also to prove that the boy was guilty of contributory neligence.

There is nothing in the facts specially found inconsistent with these conclusions.

The defendant was bound to a very high degree of care in the use for its own purposes of a highway bridge. *Mc-Adam* v. *Central Ry. & E. Co.*, 67 Conn. 445, 447. In determining what precautions against danger to human life were reasonably necessary, it was bound to consider all the uses to which the bridge was customarily put. It is found that it was convenient to the defendant to have the wires no higher above the truss; but convenience in such a matter is a subordinate consideration. The bridge, as part of a public highway, was open to general public use. Under the law of this State, the purposes of a highway are not regarded as wholly restricted to serving the right of passage. He who is standing on one, as a mere sight-seer to gratify his curiosity, is rightfully there. *Bunnell* v. *Berlin Iron Bridge Co.*, 66 Conn. 24, 36. The custom of boys to dive from the bridge was known to the defendant. The selectmen, who represented the town which owned it, had known of this practice for fourteen years. So far as appears they had expressed no disapproval. Silence for so long a time might naturally be taken as importing acquiescence. It was for them, and not for the defendant, to determine how the town property should be used. As far as the defendant is concerned, the plaintiff's intestate was rightfully on the truss, and the defendant owed him the duty of not unnecessarily exposing him to dangers to life which reasonable care on its part could avoid. It could have insulated the wires more effectively. It could have strung them out of the reach of one standing on any part of the bridge. It could have carried them across the river as it originally did, in a pipe laid on the bottom of the river. It could have put up a notice of danger. The trial court had the right to take into view what the company had not done as well as what it had done, in determining whether it had fulfilled its burden, under the default, of disproving the charge of negligence.

The default also threw upon it the burden of proving its

claim that the plaintiff's intestate was not himself in the exercise of due care. There were circumstances indicating that he was lacking in this. There was no proof of any justifying cause for his grasping the wire, and it was in proof that he grasped it at a time of day when he had reason to apprehend that the current might have been turned on. But while he knew the purpose which the wire served, it was not shown that he knew that there was danger in touching it. It was encased in a preparation of cotton fibre and paint. Had the casing been rubber or *gutta-percha*, the danger from contact with it would have been slight. A boy of his age is not necessarily chargeable with knowledge of the different modes of insulation and their comparative effect. That he had knowledge that the casing contained a wire, and that an electric light wire, did not, as matter of law or of logical necessity, show that he was not in the exercise of due care, under the circumstances of his situation. It was to be and was considered by the trial court; but it was not absolutely controlling.

The only proof, on the point of damages, was that the intestate was a bright, active, intelligent boy of sixteen, five feet, two inches high, who for nearly three years had been a general clerk in a village grocery and driver of a delivery wagon. This was not insufficient to uphold the award of $5,000. It is true that, since this amount is, under our statute, the extreme limit of recovery in an action for a wrong resulting in the death of the injured party, the plaintiff thus receives all that could be given for the loss of the most valuable life. It is also true that the life of this lad cannot be considered as possessing any extraordinary value. He had, however, a long expectation of life. While his earnings for the next four or five years would belong to his father, he had reason to expect to be able to earn thereafter, for a considerable period, much more than the cost of his personal support. What damage resulted from the loss of this earning capacity it was for the Superior Court to measure, as best it could, and there is nothing in the case which can be said, as matter of law, to require a lower estimate. *Broughel* v.

*Southern New Eng. Telephone Co.*, 73 Conn. 614, 620. While no evidence was offered, from tables of mortality or otherwise, of the boy's expectation of life, none, in a trial to the court, was needed, for judicial notice could be taken of the probability which such tables disclose. 17 Amer. & Eng. Ency. of Law, tit. Judicial Notice, p. 900. It is to be presumed, in support of the judgment, that the court found that his net earnings annually after he would have come of age, would have exceeded the amount of the interest which could probably during the same period be obtained on $5,000; for otherwise the judgment would amount to an annuity, equivalent to such earnings, in perpetuity. It is also to be presumed that due allowance was made for the anticipation of these earnings by force of a judgment which was payable immediately.

The evidence, which has been included in the record under the provisions of General Statutes, Rev. 1902, § 797, discloses no cause for correcting the finding, in any of the particulars requested by the appellant.

The superintendent of the defendant company, having been qualified as an expert, testified in chief that he constructed its line and had the pole, at the side of the draw nearest to the point where the boy was killed, bolted to the piling of the bridge. He was then asked his reason for doing so, rather than for setting it out in the stream. Objection being made, the reason was claimed as tending to show that it was put in a proper place; but the court excluded the evidence.

The duty which the defendant owed, in constructing its line, to regard the safety of those using the bridge for bathing purposes, required it to use reasonable care to select a proper location for this pole. The witness should therefore have been allowed to state the reason which governed its action in that respect. The record of the evidence, however, shows that immediately after this ruling of the court the witness was asked whether on the day of the injury to the plaintiff's intestate the entire line was in all respects properly constructed, and gave an affirmative answer. Under General Statutes, Rev. 1902, § 797, it is proper for us to examine the whole

record in disposing of this assignment of error, and the question and answer thus admitted are found in the statement of the evidence, though not in the special finding of the court. In view of that answer, no substantial harm can have been done by the exclusion of the preceding question.

The same witness having testified in chief that the cross-arm on the pole above described was fifteen feet lower than that on the pole standing next in the line on the same side of the draw, and that this was done to lessen the strain on the former and the risk of the falling of the wires in a high wind, was asked on cross-examination as to what would have been the expense of putting in an intermediate pole to reduce the strain and then elevating the wires across the draw, and replied that it would have cost about $60. The objection to this cross-examination was properly overruled. The defendant was not an insurer of the safety of those undertaking to walk up the truss. It was not bound to guard it, at any cost. It was bound to guard it within reasonable limits, and in determining those limits the expense of adopting another mode of stringing the wires was a legitimate subject of consideration.

Another expert was introduced by the defendant, who had inspected the line over the bridge in 1902; the defendant claiming that it was then in the same condition as at the time of the accident, except as to one small section. As a preliminary to showing by him that it was properly constructed as it stood in 1901, he was asked to describe it as it was when he saw it, except as to the particular section which, it was admitted, had been changed. The court excluded this inquiry, and did not exceed the limits of its discretion in so doing. The evidence sought was remote in character; corroborative, at best; and the same object could have been attained by a hypothetical question, based on the testimony of those witnesses who had described the arrangement of the line in 1901.

There is no error.

In this opinion the other judges concurred.