SYKES *v.* VILLAGE OF PORTLAND.

1. NEGLIGENCE—ELECTRICITY—PRECAUTIONS TO AVOID CONTACT—
   TELEGRAPHS AND TELEPHONES—PROXIMATE CAUSE.

   Where defendant village constructed a lighting system,
   using heavily charged wires, dangerous to human life,
   and thereafter permitted a telephone company to erect
   poles and extend its wires in the streets, passing in one
   place over the wires of the village, and where it appeared
   that one of the poles of the telephone company was not
   properly guyed up or braced, so that wires sagged and
   came in dangerous proximity to the wires of the light-
   ing plant at the place of crossing, and there was evi-
   dence tending to show defective or insufficient insula-
   tion, resulting in the burning off of a wire, and the death
   of a child who came in contact with it, the question
   of the negligence of defendant village was properly left
   to the jury. It could not be determined as a question
   of law that, because the wires of the village lighting
   plant were first in place, the negligence of the telephone
   company was the proximate cause of the injury.

2. SAME—MUNICIPAL CORPORATIONS—GOVERNMENTAL FUNCTIONS.

   A municipality is not relieved of liability for negligence,
   in constructing or maintaining an electric light plant
   used for commercial purposes, on the ground that its
   business relates to governmental functions. When a
   dangerous condition becomes apparent, the officials in
   charge of the lighting system are charged with the duty
   of removing the danger, if possible, and stand in no dif-
   ferent situation than do employees of a private corpora-
   tion.[1]

   ---

   [1] On the question of municipal liability for injury to, or
   death of, traveler from electricity carried by wires strung
   along highway, see note in 22 L. R. A. (N. S.) 1176. And as
   to municipal liability for injuries by electric wires and appli-
   ances, generally, see note in 20 L. R. A. (N. S.) 648.
   The question of liability for injury or death of traveler com-
   ing in contact with electric wire in highway, generally, is dis-
   cussed in notes in 31 L. R. A. 566 and 22 L. R. A. (N. S.) 1169.

3. EVIDENCE—IDENTIFICATION.

Evidence tending to show that a witness cut off one end of the broken wire and took it to the office of the electric light company, that another witness was there, saw it, and the exhibit looked like the end of the piece, as he testified, that another witness cut off the small piece offered in evidence, and had been informed that the wire was the broken wire in question, warranted the court in receiving the exhibit as evidence.

4. SAME—OTHER SIMILAR WIRE.

It was not error to receive in evidence a piece of wire that ran parallel to the broken section, showing similar defects to those claimed to have existed in the insulation of the fallen section of wire.

5. APPEAL AND ERROR—MORTALITY TABLES AS EVIDENCE.

Technical errors in the admission of evidence and in charging the jury, not shown to be prejudicial, *held*, not reversible, the judgment being small.

Error to Ionia; Davis, J. Submitted April 15, 1913. (Docket No. 64.) Decided October 1, 1913.

Case by John Sykes as administrator of the estate of John Sykes, Jr., deceased, against the village of Portland and Citizens' Telephone Company for the wrongful killing of intestate. Judgment for plaintiff. Defendants bring error. Affirmed.

*Thomas E. Barkworth, William J. Stuart,* and *R. A. Hawley,* for appellants.

*Ellis & Ellis* and *Scully & Davis,* for appellee.

KUHN, J. This is an appeal from a judgment recovered by the appellee, as administrator of the estate of John Sykes, Jr., deceased, against the appellants, the village of Portland and the Citizens' Telephone Company, for wrongfully causing the death of his son, said John Sykes, Jr.

The defendant the village of Portland has since 1896 maintained and operated an electric lighting

plant, which is used both for municipal lighting and
for furnishing light to private consumers.  Prior to
1902 it had erected its wires along Brush street, an
east and west street in said village.  Crossing Brush
street at substantially right angles are Kearney and
Grant streets, and midway between these streets an
alley runs north from Brush street.  In 1902 a fran-
chise was granted the Citizens' Telephone Company

to erect its poles and maintain them with necessary
equipment for an electric telephone system.  A line
of poles was placed on the alley running north and
south, and wires were also stretched diagonally across
Brush street and to a point in the alley about 58 feet
north of the north line of Brush street.  The relative
situation of the poles and wires at the time of the
accident which gave rise to this litigation is shown
by the annexed plat, which is admitted to be approxi-
mately correct.

About 50 feet from the east line of the alley, on

the north side of Brush street, the village had a pole
from which electric light wires were extended to a
pole on the west side of the alley about 79 feet north
of the north line of Brush street. This pole, desig-
nated as "Pole No. 1" on the plat, contained a trans-
former. Across the alley and a little south from this
pole was a pole of the telephone company, designated
as "Pole No. 2" on the plat. The electric light wires
were stretched underneath the telephone wires.

On the 21st day of April, 1909, plaintiff's decedent,
a boy between nine and ten years of age, while pass-
ing along Brush street came in contact with one of
the electric light wires which had become severed at
a point about 10 or 15 feet from pole No. 1. No one
saw the accident, but it is conceded that the contact
caused his death. The short end of the broken elec-
tric light wire hung down from the transformer pole,
and the long end had been carried by the wind or the
recoil of the wire over the other electric light wire,
which still remained intact, and had slid down this
wire toward the street. When found, it extended
across the worn path used as a walk to the electric
light pole on Brush street near the house of a Mr.
Flowers, being designated on the plat as "Pole No.
3." The body of the boy was found in the path
about six feet from this pole. The wires of the vil-
lage carried about 2,000 volts of electricity and were
of copper with ordinary cotton insulation. The tele-
phone wires were uninsulated and carried only a
small quantity of electricity. The telephone pole on
the east side of the alley at the time of the accident
was leaning from the perpendicular to the west sev-
eral feet, and no guy wires or support of any kind
had been placed to maintain it perpendicular. Ac-
cording to the reports of the weather bureau, a
strong wind had been blowing during the day, and
at 4 o'clock in the afternoon, which is, at least ap-
proximately, the time of the accident, it was blowing

not to exceed 35 miles an hour, and there was a space of about 14 inches between the two sets of wires. It also appeared that about a year before this accident, at the point where these wires crossed in the alley, the electric light wires and telephone wires came into contact and burned off two inside telephone wires.

An employee of the Citizens' Company testified that, when the wires came together the year before, the insulation on the electric light wires was "roughed up in two places," and that so far as he knew they were never taped again until the accident happened.

At the time of the trial the remaining electric light wire, which had not been removed at the time of the accident, was taken down and its insulation was discovered to be frayed at the places underneath the wires of the telephone company above it.

The declaration alleges that the immediate cause of the wires being down was as follows:

"That afterwards, to wit, on the 21st day of April, 1909, while said poles of the Citizens' Telephone Company were so insecurely fastened and were without support or guy wires or otherwise, and when its uninsulated wires were sagging and in close proximity to the highly charged, poorly insulated electrical wires of the village of Portland, and when no guards of any kind had been provided by either of the said defendants to keep said wires from coming in contact with each other, and when the said wires of the village of Portland so uninsulated and heavily charged with electricity were running diagonally across said alley west of the property owned by the said Flowers in the village of Portland, close to and underneath the wires of the Citizens' Telephone Company, and while a strong wind was blowing, causing the said corner pole of the said Citizens' Telephone Company to sway and its wires to sag and strike said heavily charged electrical wires of the village of Portland where its wires were uninsulated and where they crossed said alley between Kearney and Grant streets at a point north of Brush street, and by reason of said contact or the weakness of the said heavily

charged electrical wires of the village of Portland, caused by previous contact with the said Citizens' Telephone Company's wires, one of said highly charged wires of the village of Portland burnt off, or broke off, and fell to the ground, and by reason of such falling hung from the aforesaid pole of the village of Portland standing on Brush street, to which one end of said wire was joined to the pole, and the free, broken end extended across a portion of the street, the part of the street used as a sidewalk, and across the path of pedestrians who walked along the north side of Brush street."

The grounds of negligence alleged by the plaintiff are concisely stated in the brief of counsel for the defendant village of Portland as follows:

"So far as the village of Portland is concerned, negligence is averred in that the village in its authority to the Citizens' Telephone Company through the ordinance neglected to provide reasonable safeguards and to require the company to so construct and maintain its poles and wires and crossarms that in case of storm or accident its wires might not by sagging or otherwise come in contact with the heavily charged primary wires of the village; further, that the village did not cause its switchboard and contributing office to be so arranged that notice would be given to the men in the office of the condition of the wires, and did not keep a man constantly in attendance to look after and attend such wires, and that the village left its heavily charged wires in proximity and where they would be liable to, and did in fact, come in contact with the wires of the telephone company; that it further carelessly and negligently omitted, when it permitted the Citizens' Telephone Company to run its lines along said alley, to place a pole on Brush street west of said alley and run the two wires north from that point and avoid crossing the wires of the said defendants; and further that the village knowing that the wires of the Citizens' Telephone Company were strung and left within a few inches of its highly charged wires, were in such close proximity that in case of rain, sleet, or wind, or sagging, such wires would in all human probability come together, and would either burn off the wires

of the Citizens' Telephone Company or its own wires, and well knowing that there was no support to the corner pole of the Citizens' Telephone Company, by guy wires or otherwise, and that no span pole had been erected, and that the Citizens' Telephone Company had not in any manner insulated its wires, and well knowing that the insulation of the wires of the village of Portland was broken, and poor, did not provide any span pole to keep the wires apart, or insulate its wires, or take any precaution to keep said wires from coming in contact, and did not set any pole west of said alley, and did not put its transformer on the street line, but left for a long time, to wit, for a year and over prior to the 21st day of April, 1909, said wires in said alley unprotected and in the careless condition described. And, further that it did not, when it permitted the Citizens' Telephone Company to erect and maintain its wires, provide or adopt the usual appliances or methods to prevent contact between said wires or use any device to prevent contact, but on the contrary allowed and sanctioned the construction of the lines of the telephone company, and did not itself provide any protection for its wires and did not insulate its wires, but on the contrary, for a long time after the wires of the Citizens' Telephone Company came in contact with the heavily charged wires of the village of Portland, and by reason of the contact burnt off and destroyed the insulation and weakened the said wires so that they were not strong and good, said village of Portland carelessly and negligently neglected to protect its wires or provide new wires for the wires so injured; and said village of Portland continued to allow and permit the wires of the Citizens' Telephone Company to remain within less than one foot, to wit, between four and six inches, from its heavily charged electrical wires, well knowing that in case of a storm or wind said wires would come in contact and one or the other of said wires would burn off and fall to the ground. It further alleges want of inspection by the village of Portland and the consequent failure to discover and remove the defects and weakness caused by reason of the contact of its wires with the wires of the Citizens' Telephone Company, and that the village did not maintain its wires so they would not fall and

interfere with the safe use of the highway. It further charges the village of Portland with fault in not keeping its wires insulated, and that in the construction of its plant it did not arrange for its transformers to be placed on the poles of its main lines so that highly charged wires would not be needlessly run across private property, and with neglecting to have a transformer on its pole in the street and have the electric current reduced before it went through private property or across streets, sidewalks, or alleys."

The plaintiff did not urge all of the averments of negligence above set forth, but, for the most part, they were submitted to the jury by the trial judge.

The village of Portland now urges that the court did not properly submit to the jury the question of proximate cause. It is claimed that they were first on the ground and that their poles and wires were in position when the franchise was given to the telephone company, and that, if any negligence was shown which resulted in the death of plaintiff's decedent, it was the negligence of the Citizens' Telephone Company and not that of the village. The plaintiff claims that after both lines were constructed, crossing each other, a duty developed upon each party to see that these lines did not come together and burn off and fall to the ground, and that one of the defendants could not excuse itself because it was on the ground first.

There does not seem to be any question that the telephone pole had been leaning over into the alley, bringing the wires into close proximity, so that they were not more than 14 inches apart, which experts testified was dangerous proximity. It is claimed that a reasonable inspection would have discovered this condition, and ordinary prudence would have caused both defendants to have taken proper precautions to prevent accidents by straightening the telephone pole, or replacing the insulation on the highly charged

electric wires, or taking other precautions to prevent the wires from coming together.

Whether these defendants acted as an ordinarily prudent man would have acted under the circumstances was properly submitted to the jury. It must be said that this accident was the result of concurring causes, the removal of any of which would have prevented the accident.

The question of proximate cause arose in the case of *Warren* v. *Railway Co.*, 141 Mich. 298, at page 302 (104 N. W. 613). The court said:

"In this connection it is urged that the proximate cause of the injury was not the want of insulation, nor the failure to guard the span wire, but it was the breaking of the tree. It is generally the case that an accident is the result of concurring causes. If the rain and snow never fell and the wind never blew, wires would be less likely to fall and break. In this case the span wire was hot where it was not intended to be. The telephone wire was pressed upon it when it was not so intended. The wire burned in two from the intense heat taken on from the span wire, and the ends fell. All of these were things to be anticipated and guarded against. If this was not done to the extent that a prudent man would do it, there was a failure of duty, which might be a concurring cause of the accident, making defendant liable. Thus we held that, where a horse was caused to struggle and injure his master through getting his foot through a hole in a bridge, the defect in the bridge was a proximate cause of the accident."

In addition to the authorities cited in that opinion, see, also, *Electric Railway Co.* v. *Shelton*, 89 Tenn. 423 (14 S. W. 863, 24 Am. St. Rep. 614); *Fox* v. *Village of Manchester*, 183 N. Y. 141 (75 N. E. 1116, 2 L. R. A. [N. S.] 474); *Cumberland Telephone & Telegraph Co.* v. *Ware's Adm'x*, 115 Ky. 581 (74 S. W. 289).

Exception is taken by the counsel for the village of Portland to the following request to charge, which was given:

"*Fifth.* It is claimed by the village of Portland when it erected its wires and poles that the construction at that time was correct, and that if any liability attaches it is from the fact that the Citizens' Telephone Company, when erecting its own poles and constructing its wires, found the defendant village already in position under legal authority, and upon it was imposed the duty of doing everything that would be necessary for the protection of life and property; that it should have constructed its wires in some other way or put proper guy wires to its poles and used a guard wire, or some other instrumentality to keep its wires from coming in contact with the wires of the village. It is true that it was the duty of the Citizens' Telephone Company, when it erected its poles and put up its wires, to use all necessary precaution to keep the wires from coming in contact with the highly charged wires of the village of Portland, but it does not by any means follow as a legal consequence that the existence of that duty relieves the defendant the village of Portland from its own duty in the premises. If it knew that these wires were in close proximity to each other, or that the poles of the Citizens' Telephone Company were sagging and bringing its wires in closer proximity, it should have taken steps to relieve the situation from danger and not have remained inactive simply because some other company had come to have a legal obligation to the public imposed upon it. If, after the village of Portland, defendant, placed its poles and constructed its wires, new facts or conditions arose making, in view of them, its first construction dangerous to the public, then it was their duty to have acted and so arranged their wires as to have rendered it improbable of contact at a point where it would be dangerous if it remained. If the situation was such as would have enabled the village of Portland to have forced by request or otherwise the Citizens' Telephone Company to remedy the evil, then it was the duty of the village to make such request and see that the evil was remedied. If it failed of success in that regard, it should have applied some proper remedy itself."

It is contended that this gave the jury the right to

find the village guilty of negligence in the case at bar because of the nonaction or improper action of its legislative branch. While there are averments in the declaration on which such a claim might be based, no such claim was made by plaintiff's counsel on the trial, and this was admitted and repeatedly stated in the presence of the jury. The only duty urged by plaintiff devolving upon the defendant village is the same duty devolving upon any private corporation running an electric light plant in a city or village. This electric light plant was erected for commercial purposes, and, as this court held in *Hodgins* v. *Bay City*, 156 Mich. 687 (121 N. W. 274, 132 Am. St. Rep. 546), the village is not relieved from liability for the neglect of its employees on the theory that the business relates to local governmental functions. See, also, *Brantman* v. *City of Canby*, 119 Minn. 396 (138 N. W. 671).

When a dangerous condition became apparent, it was the duty of the village officers in charge of the plant, if possible, to remove the danger, and, if the situation was caused by the telephone company, it was the duty of the village officers and employees to request them to remove it. In this regard it seems to us they occupy no different position than the officers and employees of a private corporation would occupy under similar circumstances. The requests to charge given by the court with reference thereto were proper.

Upon the trial a short piece of wire was introduced in evidence identified as Exhibit 4, and it was claimed that it was cut from the loose wire which hung down from the transformer pole No. 1 on the day of the accident. It is urged that it was error to admit this exhibit in evidence, as it was not sufficiently identified. Witness Teachout, who had been in the employ of the village shortly before the accident and also in the employ of the telephone com-

pany, but at the time of the trial was working for the telephone company, testified that on the afternoon of the accident he took both ends of the broken wire down from one pole to the other and took them to the offices of the Electric Light Company, and said he thought witness Knox was in the office when he left it there. Witness Knox testified that he was in the office when Teachout brought the wire in and assisted in making measurements from the transformer pole to the telephone wires, and stated that the distance was about the same as the length of the short wire brought in by Teachout, and, while he would not be positive, said that Exhibit 4 looked like the end of the small wire brought in by Teachout. Witness Jenkins, who was in the employ of the village in the electric light business, testified with reference to this exhibit as follows:

"Yes, sir; I saw the wire from which this (Exhibit 4) was taken from; cut it off myself from the piece; couldn't tell just exactly how long a piece it was; should judge 7 or 8 feet long. That piece of wire was brought to the office by Teachout and Knox and it was cut off by me; it was then in the same condition which it is now. I have measured the distance from pole No. 1 to pole No. 2. The distance between the poles, center of the butt to each pole, is 24 feet and 6 inches, I think; made figures of that last night. Pole No. 1 from the ground to the top is 25 feet and 5 inches; from the top of the pole to the crossarm is 8 inches and a half."

On cross-examination he admitted he was not in the office at the time Teachout came in with the wire but relied upon what was told him. It appears that it was his duty to look after the wires, and it does not appear that there were any other wires in the office that were connected with the transaction. Counsel for the village admitted that Exhibit 4 was the end of the wire which hung from the transformer pole. This chain of evidence and circumstances were strong

enough to warrant the jury in believing that Exhibit 4 was, what it was claimed to be, a part of the broken wire which caused the death of plaintiff's decedent.

Objection is also made to the reception of Exhibit 14, which was a piece of wire taken from the companion wire of the one that was broken. This wire remained in position at the time of and after the injury in question and continued to remain in use until near the close of the trial, when it was removed, under the direction of the village authorities, brought to court, and received in evidence. Its purpose was to show that there were also marks or rough places on the upper part of the insulation of this wire at the point where the telephone wires crossed. The evidence shows conclusively that the wire was the identical wire that ran parallel with the wire that burned off on the day of the accident, and that it had been kept in such a condition that injury had not been done to it since that time, until it was taken out and offered in evidence. Under these circumstances it was not error to allow the jury to consider it with all the other evidence in the case.

Our attention is called by the plaintiff to the fact that the defendants in this case sued out a joint writ of error but filed no joint errors, and that the Citizens' Telephone Company complains of error committed by its codefendant. It is urged that these assignments of error relied upon by the telephone company should not be considered on this appeal. They relate to the admission of evidence; and, as we find that no error was committed, it is unnecessary to pass on that question.

The remaining assignments of error have been considered. The charge of the court was comprehensive and clear and the case was fairly submitted to the jury.

Complaint is made of the admission of the mortality tables in evidence and the instruction of the court

with reference to damages. Considering the amount of the judgment, $1,200, if technical errors were committed we are not prepared to say that they were sufficiently prejudicial to warrant a reversal of the case.

Judgment is affirmed.

STEERE, C. J., and MOORE, MCALVAY, BROOKE, STONE, OSTRANDER, and BIRD, JJ., concurred.