SYKES *v.* VILLAGE OF PORTLAND.

1. ELECTRICITY—MUNICIPAL CORPORATIONS—NEGLIGENCE.

Plaintiff brought case against the village of Portland and the Citizens' Telephone Company for injuries received by her in attempting to rescue her infant son, less than ten years of age, from contact with a live wire. Defendant village operated a plant for lighting used for municipal electrical service, both public and private. Plaintiff charged lack of support and insecure fastening of the telephone wire, and lack of proper guards or insulation, and that the telephone wires during a storm sagged and came in contact with the heavily charged wires of the village of Portland, and that one of the wires, which broke off, was allowed to hang down for a long time in a very dangerous condition on a public thoroughfare. *Held,* on a review of the testimony, that the questions of negligence and contributory negligence were for the jury, and the court properly declined to direct a verdict for either defendant.

2. SAME—EVIDENCE—EXPERT AND OPINION TESTIMONY—MODE OF CONSTRUCTION—SAFETY OF METHOD OR POSITION.

The opinion of an expert on the subject that the distance between the wires was dangerous and the wires would not be safe unless placed about 40 inches apart was admissible over the objection that it involved the question for the jury to pass upon.

3. SAME—CHANGES AFTER THE ACCIDENT.

Testimony that after the accident the telephone wires had been fixed so the two could not come together, offered to show that whatever marks appeared on the light wires were made before the injury and to show that the wires were not afterwards affected, *held,* to be proper for the indicated purpose and that it could not be excluded because it was incompetent for another purpose.

4. SAME—EXPERT TESTIMONY—TRIAL.

It was also permissible to show, by the testimony of experienced witnesses, that a person might get a shock sufficient to knock him down without burning him, amplified

by the cross-examination of another witness along similar lines.

5. SAME—EXPERIENCE.
It was, however, erroneous to receive evidence of an inexperienced electrical worker as to his individual experience under dissimilar conditions, since it tended to raise a collateral issue.

6. EVIDENCE—MEDICAL AUTHORITIES—WITNESSES.
The trial court committed reversible error, on cross-examination of one of the medical experts of defendant, in permitting counsel, on interrogating the witness, to show what certain medical authorities claimed and that the question was differently answered by others, as the testimony tended to interject the opinions of persons who were not witnesses in opposition to the opinions of some of the witnesses of defendants, who were charged with negligently maintaining light wires.

Error to Ionia; Davis, J.  Submitted June 22, 1916. (Docket No. 102.)   Decided September 26, 1916.

Case by Mary A. Sykes against the village of Portland and the Citizens' Telephone Company for personal injuries.  Judgment for plaintiff.  Defendants bring error.  Reversed.

*T. E. Barkworth* and *Richard Price,* for appellant village of Portland.

*R. A. Hawley,* for appellant telephone company.

*Ellis & Ellis* and *E. M. Davis,* for appellee.

STONE, C. J.  The plaintiff, a married woman, brings this action to recover damages against both defendants by reason of an injury which she claims she received on April 21, 1909, at the village of Portland by an electric shock which she received in trying to rescue her son, John Sykes, Jr., a boy between nine and ten years of age, from contact with a fallen village electric light wire which caused the boy's death.

Since the trial of the instant case, a former case, involving damages under the death act (3 Comp. Laws, § 10427 [3 Comp. Laws 1915, § 14577]) for the death of the son, and arising out of the same general facts, has been determined by this court, namely, *Sykes* v. *Village of Portland*, 177 Mich. 290 (143 N. W. 326). While many of the questions involved in this record are different from those raised and determined in that case, yet a reference to that case will aid in an understanding of this case.

The defendant the village of Portland, in Ionia county, has since 1896 maintained and operated an electric lighting plant, which is used not only for municipal lighting, but also furnishes lights to the inhabitants who desire to buy the same from the village. Prior to 1902 it had erected its wires along Brush street, an east and west street in said village. Crossing Brush street at substantially right angles are Kearney and Grant streets, and midway between these two streets an alley runs north from Brush street. About 50 feet east of the east line of this alley the village had a pole from which electric light wires were extended from the lights on Brush street to a pole on the west side of the alley, about 79 feet north of the north line of Brush street. This latter pole contained a transformer, or step-down, which lessened the current for use at two houses situated on Grant street respectively northwest and southwest from the transformer. These conditions existed when, in 1902, the Citizens' Telephone Company (the other defendant herein) was granted a franchise by the village of Portland to erect its poles and maintain them with necessary wires, etc., for an electric telephone system. Subsequently the said telephone company erected poles on the streets and alleys of Portland, including a line running north and south on the alley in question, also a line running diagonally across Brush street, and to a point in the

alley about 62 feet north of the north line of Brush street. The relative situation of the poles and wires at the time of the accident which formed the basis of this action is shown by the diagram appearing in the opinion in the case in 177 Mich., above referred to.

On the 21st day of April, 1909, plaintiff's said son was passing along Brush street, and in some manner came in contact with the fallen village electric light wire which ordinarily passed from the pole about 50 feet east of the alley on Brush street to the transformer pole on the west side of the alley. As a result of this contact the boy was killed. The immediate cause of the condition of the wire is stated in the declaration in the instant case as follows:

"That afterward, to wit, on the 21st day of April, 1909, while said poles of the Citizens' Telephone Company were so insecurely fastened, and were without support, or guy wires or otherwise, and when its uninsulated wires were sagging and in close proximity to the highly charged, poorly insulated electrical wires of the village of Portland, and when no guards of any kind had been provided by either of the said defendants to keep said wires from coming in contact with each other, and when the said wires of the village of Portland so uninsulated and heavily charged with electricity were running diagonally across said alley west of the property owned by the said Flowers in the village of Portland, close to and underneath the wires of the Citizens' Telephone Company, and while a strong wind was blowing, causing the said corner pole of the said Citizens' Telephone Company to sway, and its wires to sag and strike said heavily charged electrical wires of the village of Portland, where its wires were uninsulated, and where they crossed said alley between Kearney and Grant streets, at a point north of Brush street, and by reason of said contact, or weakness of the said heavily charged electrical wires of the village of Portland, caused by previous contact with the said Citizens' Telephone Company's wires, one of said heavily charged wires of the village of Portland burnt off or broke off, and fell to the ground, and by reason of

such falling hung from the aforesaid pole of the village of Portland standing on Brush street, to which one end of said wire was joined to the pole, and the free broken end extended across a portion of the ground, the part of the street used as a sidewalk, and across the path of pedestrians who walked along the north side of Brush street, and said wire hung then and there for a long time from said pole charged in a dangerous and unsafe manner, to wit, charged with 2,000 volts."

No one saw the boy at the time he came in contact with the wire. When found he was in a little path about six feet from the electric light pole on Brush street, from whence the wires led to the transformer pole. There was no sidewalk on the street at that point, but a worn foot path where people passed between the pole and the lot line. The accident occurred about 4 o'clock in the afternoon. The averments of the declaration as to the immediate circumstances attending the injury, the conduct of the plaintiff, and the consequences following, are set forth as follows:

"That when the said John Sykes, Jr., came in contact with the said wire, he fell to the ground upon his back, with said wire lying across his hand, his feet resting in the path, or sidewalk so called, and his head and body extending to the southwest, and while he was in this position, the plaintiff in this case, who is the mother of the said John Sykes, Jr., was notified that her son was lying on the ground and burning up; that at that time she was at her home, which was from six to eight rods from the place where the boy lay; that she ran from the house in great haste and excitement, and discovered him lying, as above indicated, on his back on the north side of Brush street in the village of Portland; that she feared for his life; that while he was so lying on his back, his eyes and mouth moving, a fire was apparently burning in his hand, and he was apparently alive, and she thought the boy was still alive, and that he was unable to get up; that she believed that she could save the boy's life; that she then and there grabbed him, asked him to get

up, and tried to pull him away from the position he was then in; that she did not then know or appreciate that it was dangerous or unsafe to touch his body, and did not appreciate his real condition; that when the plaintiff came in contact with the electrically charged body of her son, by seizing him with her hands, she received a powerful shock, so that she was knocked to the ground with great force, and fell backwards, dragging the boy with her; that just what plaintiff then did she does not know, for, by reason of the shock and fall, she did not recover her senses for, to wit, three days, and she has no recollection of the boy's funeral or burial; that plaintiff in some manner got the body of her son, the said John Sykes, Jr., away from the contact with the said wire, and that in so doing she was so shocked and injured that she has never recovered therefrom; that by reason of the shock and fall she so received, which she alleges was occasioned by the carelessness and negligence of the defendants as set forth in this declaration, and without fault on her part, she was permanently injured in her spine, chest, right arm, right limb, stomach, lungs, and bowels, and that her right arm has been useless, and she has been growing worse from the time of said shock to the present time, all of which was occasioned by the carelessness and negligence of the said defendants, and while she was attempting to save the life of her son, so occasioned by the negligence as aforesaid; that the plaintiff has lost her health and suffered great pain, and become, by reason of the electric shock and fall occasioned thereby at the time aforesaid, a permanent cripple, and will for the balance of her life have to be, and will remain a cripple and an invalid, without any enjoyment of her life; that before the time of the death of the said John Sykes, Jr., above set forth, and the injury to herself, as stated herein, this plaintiff was a strong and healthy woman, and had not suffered from any complaint or weakness, except that during her life, since puberty, occasionally at the season of her monthly periods, she would have what was called rush of blood to the head, which would occasionally cause dizziness or fainting, but she would immediately on commencing to flow be all right and able to discharge all her duties and exercise all the

functions of her body and mind; that this trouble was not constant and never occurred during pregnancy, or while she was nursing children, and it never caused her more than temporary inconvenience, and that at the time of the injury complained of in this case, and for more than a year prior thereto, the plaintiff had no weakness, except what was occasioned by her age, which was then about 44 years, and being then passing through what is called a 'change of life'; that she had always been able to perform housework and other manual labor, and was a strong, healthy woman, and had no ailments, except the ailments above referred to, which she reasonably expected would, in time, pass away and leave her, as she always had been, a strong, able-bodied woman in good health, strong limbs, upright carriage, and possessed of all her powers, except as herein stated."

Upon the issue framed on this declaration there was a great volume of testimony upon the trial, the case presenting a printed record of more than 650 pages. There was a sharp conflict in the evidence, and nearly every claim made by the plaintiff was strenuously controverted by the defendants, not only upon the facts, but also upon the expert testimony of which there was a great volume. The case was submitted to a jury in a lengthy charge, and the trial resulted in a verdict and judgment for the plaintiff against both defendants in the sum of $6,000 damages.

There was no motion for a new trial, but the case is here upon writ of error on behalf of both defendants who have assigned, severally, many errors. The case was presented to this court upon briefs. On behalf of the defendant Citizens' Telephone Company it was said that the several questions raised by the assignments of error naturally arrange themselves in groups as follows:

(1) Expert testimony as to safety of defendant's wires.

(2) Subsequent change of wires in alley.

(3) Opinion evidence as to effect of electric shock.

(4) Cross-examination as to contents of medical works.

(5) Permitting Dr. Allen to rebut diagnosis of defendant's physicians.

(6) Impertinent cross-examination by plaintiff's counsel.

(7) Admission in evidence of Exhibit 14.

(8) Should the court have directed a verdict for the telephone company?

(9) Court's charge as to separate liabilities of telephone company.

(10) Nature of plaintiff's ailment.

(11) Duty of defendants.

(12) Plaintiff's contributory negligence.

(13) Charge of court as to plaintiff's previous condition of health.

(14) Measure of damages.

We will consider the questions in the order stated.

1. Expert testimony as to safety of defendant's wires.

Upon the trial plaintiff's witness Hicks was asked the following questions by plaintiff's counsel, and made the following answers:

"*Q.* Assuming what I have stated concerning the position of these wires, and that they run as indicated as to the distance apart they are, where they cross in the alley, and that they ran as stated or shown on the map or model there, what can you say whether or not that is a safe construction?

"*Mr. Hawley:* Object to it as incompetent for the reason already stated.

"*Q.* Is it reasonably safe construction?

"*A.* No, sir.

"*Mr. Hawley:* Take exception.

"*A.* Yes sir. I would say it is not reasonably safe.

"*Q.* What is the matter with it? Tell the jury.

"*A.* I understand these are the high tension wires or the primary wires running to the transformer from No. 3 to transformer pole No. 1, carrying the wires 8 to 14 inches of the telephone wires, which is not considered a safe distance. We have never considered it safe to put them that close. This pole No. 2 is not

guyed; so it would have a tendency to pull over from the wind blowing this long spans here. The wires carried from No. 2 to No. 8 is a long spans, and from No. 2 to No. 6 is a long spans, too heavy a spans for this pole to support without guys. I would not consider it properly constructed.

"*Q.* What change could be made to make it safe?

"*Mr. Hawley:* Object to it as incompetent and immaterial.   *   *   *

"*Mr. Ellis:* The question is, What changes necessarily would have to be made to make it safe?

"*The Court:* He may answer. (Exception.)"

The witness was also permitted to answer the following question over objection and exception:

"*Q.* Is there any other way that could have been arranged to make it less hazardous than with what is now or was at the time of this accident?"

After the witness had testified that they always figured on keeping electric light wires charged at 2,000 volts placed about 40 inches from the telephone wires, plaintiff's counsel asked him, and he was permitted to answer the following question over defendant's objection and exception:

"*Q.* Would any nearer location than that be safe?"

The answer was: "No."

It is urged by said defendant that one of the questions which should have been eventually submitted to the jury as a question of fact for its determination was this very question, and that this was a question for the jury to answer, according to their own judgment and without being controlled or influenced in that respect by the judgment of any expert or nonexpert witness, and the following cases are cited: *Harris* v. *Township of Clinton,* 64 Mich. 447 (31 N. W. 425, 8 Am. St. Rep. 842) ; *Kelley* v. *Railroad Co.,* 80 Mich. 237 (45 N. W. 90, 20 Am. St. Rep. 514) ; *Girard* v. *City of Kalamazoo,* 92 Mich. 610 (52 N. W. 1021) ; *Kraatz* v. *Light Co.,* 82 Mich. 457 (46 N. W. 787) ;

*People* v. *Plank Road Co.*, 125 Mich. 366 (84 N. W. 290) ; *Lindley* v. *City of Detroit*, 131 Mich. 8 (90 N. W. 665).

We think that an examination of the above-cited cases will show that they are readily distinguished from the instant case. The witness was an expert, and was called and testified as such.

In *N. & M. Friedman Co.* v. *Assurance Co.*, 133 Mich. 212 (94 N. W. 757), a hypothetical question detailing the method adopted to remodel and improve the interior of a building, and asking if witness thought such construction safe, was held not objectionable as not a proper subject for expert testimony. In that case one ground of the objection was that it was the very question which the jury was to pass upon in the case.

In *Transportation Line* v. *Hope*, 95 U. S. 297, it was said, concerning a transportation agent:

"The witness was an expert, and was called and testified as such. His knowledge and experience fairly entitled him to that position. It is permitted to ask questions of a witness of this class which cannot be put to ordinary witnesses. It is not an objection, as is assumed, that he was asked a question involving the point to be decided by the jury. As an expert, he could properly aid the jury by such evidence, although it would not be competent to be given by an ordinary witness. It is upon subjects on which the jury are not as well able to judge for themselves as is the witness than an expert as such is expected to testify."

In 2 Joyce on Electric Law, § 1057, it is said:

"But the mere fact that the opinion of an expert may be upon a question which the jury is to decide is not sufficient to exclude the testimony, unless the question is such that the jury would be competent to decide it after having become acquainted with the facts as they existed at the time of the transaction, and the history of the subject to which the question relates."

See, also, *Id.* § 1059; *Nelson* v. *Lighting & Water Co.*, 75 Conn. 548 (54 Atl. 303).

Most of the cases cited by appellant telephone company relate to highways in which nonexpert witnesses were involved.

An examination of *Kraatz* v. *Light Co., supra,* will show that hypothetical questions directed to the effect of certain conditions of electric light wires as to the transfer of electricity, are proper.

In *Sykes* v. *Village of Portland, supra,* in which case a judgment for the plaintiff was affirmed, experts were permitted to testify that a proximity of 14 inches was dangerous proximity.

We are of the opinion that the court did not err in admitting this evidence.

2. Subsequent change of wires in alley.

The testimony showed that on the day in question, and after the accident, employees of the village installed a new wire from pole 1 to pole 3 in place of the broken electric light wire, and that a bracket was nailed or fastened upon telephone pole 2, and that the electric light wires were fastened to it in such a way that they could not come into contact with the telephone wires, or with each other. This testimony was elicited by the following questions asked by plaintiff's counsel of the witness Hale:

"*Q.* What can you say, witness, as to whether it has been possible for those wires to get together since the day of that accident?

"*Mr. Price:* What wires?

"*Q.* The Citizens' Telephone Company's wires and the electric light wires where they cross the alley?

"*Mr. Price:* Object to it as immaterial and improper, whether it is possible for them to get together since.

"*The Court:* How is that competent?

"*Mr. Ellis:* I shall introduce the wires that were taken off from there by the village last spring, and offer to show that the wire had been in contact many times with the Citizens' Telephone Company's wires. I want to show by this evidence they fixed it that day

of the accident in the afternoon, right then and there, they made such a change that it would be impossible after that time for these wires to get together; simply to show that whatever mark was on the electric light wires was made before that time. I do not claim anything about the change; just the same as though I wanted to show for' the same purpose, if I had shown by him, he took down that wire that day, and kept it ever since, and therefore there had been no change. The purpose is to show the wire, so far as any wires came in contact with the top of it, was done before that time, and not since.

"*The Court:* He may answer the question.

"*Mr. Price:* Exception, and I want to add to my objection the further objection that the witness was not in a position to testify."

The witness then testified to the fastening to bracket. It is urged that the effect of this testimony was to show changes after the accident. We think that the object of this testimony was plainly stated by plaintiff's counsel, and that it was competent for that purpose. We have held that testimony competent for one purpose cannot be excluded because it is incompetent for another purpose. *People* v. *Doyle,* 21 Mich. 221; *McKenzie* v. *Vandecar,* 105 Mich. 232 (62 N. W. 1031).

We do not think there was any error in this ruling.

3. Opinion evidence as to effect of electric shock.

It is the claim of the defendants that the testimony showed that there were no indications upon the hands or body of the plaintiff, after the accident, of any contact with an electric wire, or any visible marks of an electric shock, and that, in order to weaken the effect of such condition, plaintiff's counsel, after stating certain alleged facts as to the conditions at the time of the accident, asked the following question of the witness Lamb:

"*Q.* What I want to know whether a woman taking her where she stopped there—she is reaching for his collar next his face—whether she could have pulled

him loose from that wire, he lying on the ground in this position, and she runs and grabs him, without burning her hands?"

This was objected to because the question stated pathological conditions that this witness was not competent to answer. This witness was being examined as an expert electrician. The question was finally changed to the following:

"Q. How heavy a shock can you get into the body without having anything show on the outside of the body?

"Mr. Hawley: I don't know as he is an expert on that matter, and object to it as incompetent.   *   *   *

"A. I should say he could get quite a shock—a very unpleasant one.   (Exception.)

"Q. Do you know whether a person could get a shock enough to knock him down without being burned?

"A. Yes, sir; I do know it from actual experience that they could."

This last answer was not excepted to.

Another witness, a Mr. Hicks, also testified as an expert in a similar way, but gave no actual experience.

Later, while Mr. Lamb was on the stand, said defendant's counsel moved to strike out the testimony of both witnesses, as to their judgment whether or not plaintiff would get a shock in attempting to remove the boy from the wire. This motion was denied, and an exception taken. It will be noted that the motion to strike out the testimony of the witness Lamb was not limited to that relating to his own experience.

Later, and in rebuttal, a witness James Bogardus, a common laborer, was produced by the plaintiff and allowed to testify that he received an electrical shock at one time, and was permitted to testify further as follows:

"Q. Connected with what was it, what kind of a light?

"*Mr. Hawley:* Object to it as immaterial and not rebuttal.

"*Mr. Ellis:* It is claimed that electricity will not affect; if it does, it wears right off at once. I offer to show by this man he was struck by electricity over a year ago, and he feels the effects of it yet; that is what I offer to show.

"*Mr. Hawley:* I object to it as incompetent.

"*Mr. Price:* Part of their main case.

"*Mr. Ellis:* Meets the proposition they make that unless you get enough to kill it will not have any effect. * * *

"*Mr. Hawley:* This man is not an expert; it is incompetent.

"*Mr. Ellis:* I don't claim he is an expert; he is giving his own experience. * * *

"*The Court:* Dr. Knapp's testimony you want to meet?

"*Mr. Ellis:* Yes, sir.

"*The Court:* He gave his theory and belief in the matter based upon what he had read and seen. * * * He may answer. * * *

"*A.* Common incandescent light 16 candle power.

"*The Court:* It strikes me as to the other question about whether a man would receive a shock, any man would be pretty well aware whether they were shocked, as well as were injured in any other way. I think it would be competent to show that. As to the subsequent effects, there might be some question. Its immediate effect may be shown."

Over the objection that it was incompetent, the witness was permitted to answer as to the immediate effect, to which defendants' counsel excepted. The witness answered as follows:

"*A.* They were working at the schoolhouse fixing a chimney. I went in there in the morning. There was no light on. I says, 'I should think you could see better if you could move the light on.' I reached up and turned the light on. It was dark, I couldn't see it, and the brass around the socket was charged, so the minute I touched it my hand grasped right around it, I couldn't let loose of it, and I fell right back on a stove

that was there, and I hollered to get loose from that, and Dummy Cole grabbed the bulb and pulled it out. I couldn't get up. The men that were there picked me up and carried me to the basement door and sat me into a chair there. After I got done trembling and gained my strength a little I got up and went home. I couldn't use my arm that day at all. I went back and locked up the house. Gradually, after a few days kept working off, and I went on and done my work."

There was a motion to have the whole statement stricken out as immaterial and incompetent, which was refused, and an exception taken. The court remarked:

"I think as to its immediate effects he has given it may remain. * * *

"*A Juror:* Do we understand that the man grabbed hold of a globe, and couldn't let go of it?

"*A.* I couldn't let go, my hand here grasped; electricity will shut your hand as tight as can be, and you can't let loose of it.

"*A Juror:* I have taken hold of them things.

"*A.* I stood in water for one reason, some bad wiring.

"*Q.* The juryman wants to know whether you got hold of the glass, or what?

"*A.* I got hold of the brass right above in here, shut my hand over it, and I couldn't let go. I was standing where they had mixed mortar. It was wet; that brass was charged. Once before when I had reached in that way I had felt a little twinge in one of my fingers, but that time I got it, and it knocked me down quicker than blazes."

We do not think it was error to refuse to strike out the opinion evidence of the witnesses Lamb and Hicks, and the motion was not directed to the actual experience of the witness Lamb, much of which had been drawn out by defendants' cross-examination. We do think, however, the case being a close one, that it was prejudicial error to receive the testimony of the witness Bogardus as to his individual experience under

other and different conditions. It raised a collateral issue. It is urged by plaintiff's counsel that an expert may be contradicted otherwise. than by the testimony of other experts, and the cases of *Reeve* v. *Dennett,* 145 Mass. 23 (11 N. E. 938), and *Commonwealth* v. *Leach,* 156 Mass. 99 (30 N. E. 163), are cited in support of the position. An examination of those cases will show that they are readily distinguished. In the last-cited case the court said by way of illustration:

"If, for example, expert witnesses were to testify that it would be impossible to propel a vessel by steam across the Atlantic Ocean,  *  *  *  it would not be necessary in reply to call. other experts to give opinions to the contrary. The direct facts might be testified to by any person who knew them."

Here there was no such general question in dispute. The question was as to the effect under similar circumstances and conditions as shown in the instant case.

4. Cross-examination as to contents of medical works.

Plaintiff's counsel on cross-examination asked Dr. Riley the following question:

"Q. Isn't it a fact that authorities, in just such cases as that, have not yet determined whether there is molecular change or not?
"Mr. Hawley: Object to it as incompetent.
"The Court: He may state.
"Mr. Hawley: Take an exception.
"A. I think the man you are referring to there says that it is not known whether they are molecularly changed or not."

This witness had already testified that, in his judgment, the plaintiff was not suffering from any organic disease or injury to the nerves or nerve centers.

In his testimony Dr. Dewey, another of defendants' witnesses, was equally emphatic in asserting that, when nerves are affected by a shock, it does not cause

any organic or any molecular change in them, and that he knew it from observation and reading. After drawing out this fact on cross-examination the following question was asked by plaintiff's counsel:

"*Q.* It is a medical fact, or laid down as a fact, that an animal that is killed by electricity, there is a change in the condition of the nerves, a molecular change or a pathological change?

"*Mr. Hawley:* Object to it as incompetent.

"*The Court:* He may answer.

"*Mr. Hawley:* Take an exception.

"*A.* No, sir; I never heard of such a thing."

Thereupon plaintiff's counsel in the same connection asked:

"*Q.* Now, doctor, do you mean it isn't in the medical works, that doctrine advanced and sustained by authority, there can be a molecular change by electricity in the nerve?

"*Mr. Hawley:* Object to it as incompetent.

"*The Court:* He may state.

"*Mr. Hawley:* Take an exception.

"*A.* I know it is claimed, and I know the opposite is claimed by medical men. The question is an undecided one; therefore there has been no evidence to prove it."

It is claimed by appellants that the purpose of the above cross-examination was to import into the case the theory of some author to rebut or refute the testimony of these witnesses, and that the effect was to practically destroy their testimony, and the following cases are cited: *Marshall* v. *Brown,* 50 Mich. 148 (15 N. W. 55); *People* v. *Millard,* 53 Mich. 63, 75, 77 (18 N. W. 562, 567). To which may be added *People* v. *Hall,* 48 Mich. 482 (12 N. W. 665, 42 Am. Rep. 477); *People* v. *Vanderhoof,* 71 Mich. 158 (39 N. W. 28); *Fox* v. *White Lead & Color Works,* 84 Mich. 676 (48 N. W. 203).

In *People* v. *Millard, supra,* this court said:

"Another source of error quite as mischievous, * * * was the introduction of what is no more than hearsay evidence, in the shape of references to writers and books in such a way as to invoke their authority. As we have had occasion on more than one record to explain heretofore, expert evidence is only admissible on the theory that the jury cannot be supposed to comprehend the significance of facts shown by other testimony which needs scientific or peculiar explanation by those who do comprehend it. But this does not permit hearsay testimony of the written or spoken opinions of other persons, whom the jury have no means of examining as to their learning, their honesty, or their sources of special knowledge."

In *Marshall* v. *Brown, supra,* the question arose upon the cross-examination of the witness, as here. We are of the opinion that the refusal of the court to sustain the objections of defendants' counsel to these questions constituted reversible error.

5. Was there error in permitting Dr. Allen to rebut the diagnosis of defendants' physicians? We think not. See *Laughlin* v. *Railway Co.,* 62 Mich. 220, 227 (28 N. W. 873).

6. We have examined the other assignments of error relating to the admission of evidence, and are of the opinion that there was no error in the rulings, except that Dr. Riley should have been permitted to answer the following question:

"What is the fact, doctor, with hysterical patients. as to whether or not there is an element of deception and simulation mixed up with their ailments, either always or some of the time—whether characteristic with hysterical people?"

Neither do we think there was error in the refusal of the court to direct a verdict for either defendant.

We think that the charge of the court as to the duty of the defendants was well within the ruling of this court in *Sykes* v. *Village of Portland, supra.*

We think that the question of contributory negligence was one of fact, and was properly submitted to the jury. It cannot be said, in the light of the evidence, that the attempt of the plaintiff to rescue the son was so rash as to entail certain injury to her.

The charge of the court is complained of by appellants in many respects, and, among other things, that it was too general in its language. For instance, the court said, "It is for you to say whether the village was negligent, and in what way"; and it is urged that this was without limitation or qualification of any kind as to the necessity of finding that the negligence, if there was any, must be in some particular specified in the declaration, and supported by evidence at the trial.

A reference, however, to other parts of the charge shows that the attention of the jury was called to the declaration, and the negligence there alleged, and the necessity of evidence to support it.

It is also urged that in the charge the measure of damages was not properly limited, and that it was broad enough to enable plaintiff to recover for loss of earnings and earning capacity, although she was a married woman. No requests to charge upon that subject were proffered, and, while the charge was very general, yet as the error complained of would only affect the amount of the verdict, and, as the case must go back for a new trial, it is sufficient to say that upon another trial the charge should be more specific and guarded upon the subject.

We have examined all of the assignments of error which have been argued, and find no other reversible error; but for the errors which we have pointed out and which affected both defendants we feel constrained to reverse the judgment, and grant a new trial, with costs to appellants.

KUHN, OSTRANDER, BIRD, MOORE, STEERE, BROOKE, and PERSON, JJ., concurred.