[*Civ. No. 1540.   Second Appellate District.—June 24, 1915.*]

## BLANCHE E. WILBUR, Respondent, v. THE EMERGENCY HOSPITAL ASSOCIATION (a Corporation), et al., Appellants.

ACTION FOR DAMAGES—DEATH OF HOSPITAL PATIENT—NEGLIGENCE—INSUFFICIENT CIRCUMSTANTIAL EVIDENCE.—In an action against two hospital associations to recover damages for the death of the minor son of the plaintiff, while a patient in one of such hospitals for treatment for pulmonary pneumonia, based upon the alleged negligence of the defendants in leaving a solution of bichloride of mercury in the room where it could be reached by the patient, which it is alleged that the deceased got out of bed and drank while delirious and irrational and in the absence from the room of the attendant, a verdict in favor of the plaintiff is based upon mere conjecture, where there is no evidence of the presence of the solution in the room for the twelve-hour period next preceding the alleged drinking thereof, or any evidence as to the quantity or strength of the solution, and the evidence of the condition of the patient after the alleged drinking of the poison was to the effect that it was not accompanied by symptoms which manifest themselves in cases of such poisoning, but on the other hand that his symptoms were such as would follow a recurrence of acute pneumonia due to a relapse.

ID.—EVIDENCE—CAUSE OF DEATH—STATEMENTS OF DECEASED.—Statements made by the deceased that he had drank the poison are hearsay insofar as the act of drinking the poison was concerned, and are not proof that he did so, but are admissible in determining the mental condition of the patient and also in determining with what intent or purpose he took or attempted to take the poison.

ID.—EVIDENCE—ESTABLISHMENT OF THEORY BY CIRCUMSTANTIAL EVIDENCE.—A theory cannot be said to be established by circumstantial evidence, even in a civil action, unless the facts relied upon are of such nature, and so related to each other, that it is the only conclusion that can fairly or reasonably be drawn from them.

ID.—SUPPRESSION OF INFORMATION — INCOMPETENT EVIDENCE.—It is error in such an action to permit the nurse to testify that the matron of the hospital instructed her not to tell the plaintiff about her son having drunk the poison, as such declaration was not only hearsay but that of an agent concerning a past transaction.

ID.—DAMAGES—POVERTY OF PLAINTIFF.—It is error in such an action to permit the plaintiff to testify, over objection, that she had no property at the time of her son's death.

APPEAL from a judgment of the Superior Court of Los Angeles County and from orders denying motions for new trials.   Frederick W. Houser, Judge.

The facts are stated in the opinion of the court.

Gibson, Dunn & Crutcher, Norman Sterry, and Thorpe & Hanna for Appellants.

Edwin A. Meserve, Elizabeth L. Kenney, and Paul H. McPherrin, for Respondent.

SHAW, J.—This action was instituted by plaintiff, a widow, against defendants, both of which are corporations, to recover damages for the loss of her minor son, whose death it is alleged occurred as a result of negligence on the part of defendants.

A trial was had by a jury which rendered a verdict in favor of plaintiff, upon which verdict judgment was entered against both defendants and from which judgment, and an order denying its motion for a new trial, the Emergency Hospital Association appeals; and the American Hospital Association likewise appeals from an order denying a like motion for a new trial made by it.

The judgment-roll is accompanied by a bill of exceptions upon which the motions for new trial were made.

The material facts upon which the action is based are as follows: Plaintiff's son, Eugene L. Wilbur, of the age of about 18 years, was a member in good standing of the American Hospital Association which, in case of sickness of its members, undertook, in consideration of stipulated sums paid by them at regular intervals, to furnish them with such medical attendance, nursing, and hospital care as might be necessary and required during such illness. The American Hospital Association had no hospital of its own, but there existed between it and its codefendant an arrangement under and pursuant to which the Emergency Hospital Association received members of the former association who were ill and in need of hospital service, thus acting as agent for and on behalf of the association of which Eugene L. Wilbur was such member. In July, 1908, while suffering from an attack of pulmonary pneumonia, the American Hospital Association, through its regular physicians and employees, took charge of said Eugene L. Wilbur and placed him in the hospital so conducted by the Emergency Hospital Association, which latter association undertook to and did furnish nurses and hospital service in

the care of Wilbur during such illness and while treated by the physicians of the American Hospital Association. Upon entering said hospital Wilbur was placed in charge of a special nurse who, from the time he entered, about July 23d, up to August 1st, devoted her entire time and attention to his care. When this nurse took charge of him she prepared a solution of bichloride of mercury which she used as a disinfectant of the thermometer kept by her for taking the temperature of her patient. The glass containing this solution was placed upon a chiffonier in the room occupied by Wilbur, and it is alleged that while delirious and irrational and in the absence from the room of an attendant, he got out of his bed and drank the poisonous solution, the drinking of which caused his death.

The chief contention of appellants is that the evidence is insufficient to justify the verdict in that the conclusion reached by the jury, to the effect that deceased drank the bichloride solution as a result of which he died, is based upon mere conjecture. In considering this question it is necessary to refer at length to the evidence bearing upon the subject.

When deceased entered the hospital, about July 23d, his condition was such that Dr. Clark, the attending physician, who was an employee of the American Hospital Association, caused a special nurse to be assigned to his care. This nurse was Mrs. Rosmer, who testified that upon assuming charge of the patient she for the purpose of disinfecting the thermometer with which at frequent intervals she took his temperature, prepared a solution of bichloride of mercury in a small glass, said to be a jelly glass, and which from said time until she surrendered her charge at 1:30 P. M., August 1st, she kept upon a chiffonier in the room occupied by Wilbur. It appears that the condition of the patient on August 1st was such as to have justified defendants in dispensing with the special nurse, and no negligence is predicated upon the act of defendants in so doing. Upon Mrs. Rosmer's departure she left the glass containing the solution upon the chiffonier in Wilbur's room. The record is silent as to any occurrences between 1:30 o'clock and 7 o'clock P. M. of said day, but at 7 P. M. of the day that Mrs. Rosmer left, Miss Pawsey went on duty, remaining until 7 A. M. the next day, and Wilbur, among several other patients occupying rooms in the vicinity of his room, was assigned to her for care and such attention

27 Cal. App.—48

as he might require. While the condition of the patient on Saturday, August 1st, had improved to an extent that justified dispensing with the exclusive services of a special nurse, he, as stated by Miss Pawsey, after she went on duty, became restless, rang his bell constantly, called for Mrs. Rosmer frequently, complained of pains, later toward midnight becoming delirious and, as shown by the nurse's chart, both his temperature and pulse increased materially. Miss Pawsey reported his condition to Miss Maloy, the head nurse, who herself visited him a number of times during the night. About 2 o'clock A. M., August 2d, or a little later, Miss Pawsey was informed by another nurse that there was a noise in Wilbur's room, and upon entering she saw Wilbur getting back in bed. "When I entered the room," she said, "I noticed the glass; it was on the chiffonier, . . . and it had some absorbent cotton on the bottom of it that was still wet with the solution, bichloride solution." The glass had a watermark indicating that it had been about two-thirds full. The chiffonier was located so that Wilbur would have had to walk about seven feet from his bed to reach it. "I did not," she testifies, "see him drink the bichloride myself. I know of no one else that saw or was in a position to have seen it if it did occur. He simply told me that. He said he drank 'that green stuff.'" The witness further says: "When I looked on the dresser and saw the glass there I thought perhaps I could keep him from thinking that it was poison." Upon Miss Pawsey calling Miss Maloy, the head nurse, they at once administered an antidote consisting of the whites of six eggs, which caused profuse vomiting. This was between 2 and 3 o'clock A. M., August 2d, after which the patient said he was resting easily and had no pain, which condition continued to 7 o'clock A. M., when Miss Pawsey left. The witness further testified: "I did not see the patient take any poison at all. I did not see that glass until—I only know that it contained a small quantity of bichloride that the cotton was saturated with. I had never seen that before." She believed there had been poison in the glass, "because of the saturated cotton in the bottom of the glass"; and further stated that Wilbur was delirious and irrational, he stating among other things, that he thought he saw his coffin going up the street. Mrs. Rosmer upon being recalled, stated that when she arrived at 7 A. M., August 2d, Wilbur looked as well as he did when

she left him, and said he felt fine, and told her that he drank the bichloride because he was in terrible pain and they would not send for her; that he complained of no pain or burning in the throat or stomach. "I asked him about that and he stated always that he didn't feel any." Miss Maloy, the head nurse on duty that night, says that upon being informed by Miss Pawsey that Wilbur "had taken the stuff, as he called it," she went to his room where he told her that he had taken the stuff that was in the glass. She asked him how he felt, to which he replied that he felt all right and that he had no pain. She immediately prepared the whites of eggs which she administered to him, which caused him to vomit; that she examined the contents of the vomit for coloring matter in it, but found none. A second dose of the whites of eggs was administered under instructions from the doctor, which caused further vomiting, exhibiting no coloring matter of any kind; after which she gave him a glass of milk, which he retained, soon after falling asleep. She remained with him closely until she went off duty at 7 A. M., and during this time he did not complain of burning sensation in his throat, or pains in his throat or stomach, or give evidence of such pain. She further stated that there was a window in the room occupied by Wilbur, but did not remember whether there was a slop jar in the room. Other witnesses were called, none of whom had any personal knowledge of the fact as to whether or not Wilbur had drunk the solution of bichloride. Among them was Dr. Sweet, who at the time had succeeded Dr. Clark as the attendant physician in charge of Wilbur, who was not present and did not see the patient until several hours after the alleged taking of the solution. He testified that he was informed, he thinks by Mrs. Rosmer, that Wilbur had drunk the bichloride. He says the conversation was such that it made him think that she said he had taken it; there was no question about it. Wilbur died at 7:10 o'clock P. M., August 2d.

The contention of respondent is that Wilbur's death was due to poisoning from drinking the bichloride of mercury, as alleged in the complaint, rather than to a recurrence of acute pneumonia due to relapse. It may be conceded that, considered as an abstract question of law, it was negligence to have the bichloride solution in the room where it could be reached by the patient. The question however, is, Did such

negligence contribute to or cause the death of Wilbur? (*Puckhaber* v. *Southern Pacific Co.*, 132 Cal. 363, [64 Pac. 480] ; *Cary* v. *Los Angeles Ry. Co.*, 157 Cal. 599, [21 Ann. Cas. 1329, 27 L. R. A. (N. S.) 764, 108 Pac. 682].) Clearly, if he did not drink the solution, his death cannot be attributed to such negligence, however gross it may have been. It was conclusively established by the testimony of Mrs. Rosmer that there was a solution of bichloride left in a glass upon the chiffonier in Wilbur's room at 1:30 P. M., Saturday, August 1st. We have no evidence whatever showing that any one saw the glass during the period extending from this hour to 2 o'clock A. M., August 2d, at which time it appears that the attention of Miss Pawsey was directed to it by the statement made by Wilbur that he had drunk the solution. Prior to this time, neither she nor any other person, so far as disclosed by the record, had seen it after Mrs. Rosmer's departure; and as to the amount of solution contained in the glass, Miss Pawsey, from the fact that a water-mark appeared therein, drew the conclusion that it had been about two-thirds full. That Wilbur was irrational is sufficiently shown by the evidence. That Miss Pawsey and other nurses in attendance believed his statement to the effect that he drank the solution, there can be no doubt. The court, however, instructed the jury that, "While the declarations, if any, of the deceased, to the effect that he had drunk bichloride of mercury and that he did it to end the pain and to end it all and that he knew it was poison and drank it intentionally, are hearsay insofar as the act of drinking the poison was concerned and are not proof that he did drink the poison, still they can be considered by you in determining his mental condition and also in determining with what intent or purpose he took or attempted to take the said poison, if as a matter of fact you believe that he did take the said poison." Hence, under this instruction, as we think properly given, the statements made by Wilbur that he had drunk the solution cannot be considered as evidence of such fact. It is nevertheless clear, however, that the conclusion of the nurses and agents of defendants to the effect that he had taken the solution, was due to the statements so made by him, accompanied with the fact that Miss Pawsey upon examining the glass, the presence of which was unknown to her, found a small portion of bichloride solution in the bottom thereof. Plaintiff having

alleged that deceased drank the solution so left in the glass by Mrs. Rosmer it devolved upon her to prove such fact. That defendants failed to show what became of the solution, the quantity of which is not shown, constitutes no proof in support of plaintiff's allegation that he drank the poison. Omitting, as we must do, any consideration of the statements made by Wilbur as proof that he drank it, the disappearance of the solution between 1:30 o'clock P. M., August 1st, and 2 o'clock A. M., August 2d, is as consistent with the fact that it was thrown out of the window, or removed by some nurse in attendance upon him during said intervening period, or otherwise disposed of as to say that Wilbur drank it.

Moreover, not only was there no evidence as to the *quantity of the solution,* but there was no testimony rising to the dignity of evidence as to the *strength of the solution.* The evidence conclusively shows that bichloride of mercury is used medicinally, administered in doses of one-twelfth to one-sixteenth of a grain, and that as thus administered it is not poisonous. The only evidence upon which respondent relies as showing the solution to have been of poisonous strength is that of Dr. King, upon his cross-examination when called as a witness for defendants, wherein he says: "There is not any usual quantity of bichloride of mercury used in the hospital for disinfecting the thermometer. Some people use one amount, and some another. There is no fixed quantity. Q. Suppose that there was enough bichloride of mercury in the glass to act as a disinfectant—— A. Some use 1 to four thousand, and some use 1 to ten thousand. One part in a thousand is about what is generally used. One to 500 means about a grain to the ounce; five or six grains in six to eight ounces of water. That is a poison dose. However, it is hardly ever used in that strength. Q. Supposing one to a thousand? A. Yes, three grains. That is a poison dose. That does not always kill, but it has. If a patient suffering from pneumonia had taken a dose of that kind he would probably have bichloride of mercury poisoning. If I thought he had bichloride symptoms, I would expect a collapse in a short time, and vomiting, and a little later I would expect probably diarrhoea. Q. You say it would take a very much less quantity of bichloride of mercury to affect a person in that condition than a well man? A. Yes, rather. Presumably there would be enough in the glass to be a poisonous dose.

That is only a presumption." Here again we are left to conjecture whether or not the strength of this solution of bichloride of mercury, assuming that Wilbur drank it, was such, conceding the jelly glass to have been two-thirds full, as to constitute a poisonous dose, even for one suffering from pneumonia.

Again, the condition of Wilbur after the alleged taking of the solution was not accompanied by symptoms shown, without contradiction, by reputable physicians and nurses to manifest themselves in cases of such poisoning. They all agree that bichloride of mercury is an irritant poison and a poisonous dose is always accompanied with burning of the mouth, throat, and stomach, resultant pain therefrom, vomiting, and generally diarrhoea. None of these, except the vomiting, manifested itself in this case, and that, as it clearly appears, was due to the administering of whites of eggs as an antidote. Other symptoms exhibited, such as a high degree of temperature and greatly accelerated heart action, were conclusively shown to be inconsistent with the theory that Wilbur died as a result of taking a poisonous solution of bichloride of mercury. The disappearance of the solution, assuming that it was of poisonous strength and quantity, is just as consistent with the theory that it was thrown out of the window as it is with a theory that Wilbur drank it; indeed, more so, since had he drank it the effect of so doing would have manifested itself in certain symptoms, none of which was exhibited by deceased. The language adopted by the supreme court in discussing a like question involved in *People* v. *Staples*, 149 Cal. 405, [86 Pac. 886], is peculiarly applicable to the facts of this case. It is there said: "It will be perceived that the evidence in the case relied on to establish the guilt of the defendant is practically circumstantial, and it is elementary law that where the evidence is of such a character it must be not only consistent with the hypothesis of guilt but inconsistent with any other rational hypothesis. The deduction to be drawn from these circumstances is ordinarily one for the jury, but where, in a case such as this, every circumstance relied on as incriminating is equally compatible with innocence, there is a failure of proof necessary to sustain a conviction, and the question presented is one of law for the court." While that was a criminal case, the rule of evidence declared is equally applic-

able to the facts in this action.  See, also, *Shelton* v. *Hacelip,* 167 Ala. 217, [51 South. 937] ; *People* v. *Millard,* 53 Mich. 63, [18 N. W. 562] ; *Gardner* v. *Porter,* 45 Wash. 158, [88 Pac. 121] ; and *Neal* v. *Chicago, R. I. & P. R. Co.,* 129 Iowa, 5, [2 L. R. A. (N. S.) 905, [105 N. W. 197], where it is said: ''A theory cannot be said to be established by circumstantial evidence, even in a civil action, unless the facts relied upon are of such nature and so related to each other that it is the only conclusion that can fairly or reasonably be drawn from them.  It is not sufficient that they be consistent merely with that theory, for that may be true and yet they may have no tendency to prove the theory. . . . If other conclusions may reasonably be drawn as to the cause of the injury from the facts in evidence than those contended for, the evidence does not support the conclusion sought to be drawn from it.  Verdicts must have evidence to support them, and the jury will not be permitted merely to conjecture how the accident occurred.  In matters of proof they are not justified in inferring from mere possibility the existence of facts.  If it appears that the facts and circumstances from which a conclusion is sought to be deduced, although consistent with that theory, are equally consistent with some other theory, they do not support the theory contended for.''

Over defendants' objection, Mrs. Rosmer was permitted to testify that Miss Brown, the matron in charge of the nurses and an employee of the Emergency Hospital Association, instructed her not to tell Mrs. Wilbur about her son having drank the bichloride of mercury.  This was error and well calculated to prejudice defendants in the minds of the jurors. Not only was it in the nature of hearsay, but the suggestion made  by Miss Brown in nowise tended to prove the issue as to whether or not Wilbur had drunk the solution.  Moreover, it was a declaration concerning a past transaction as to which Miss Brown is not shown to have had any personal knowledge. ''The opinion of an agent, based upon past occurrences, is never to be received as an admission of his principals; and this is doubly true where the agent was not a party to those occurrences.''  (*Insurance Co.* v. *Mahone,* 21 Wall. 157, [22 L. Ed. 593].)   In *Beasley* v. *San Jose Fruit-Packing Co.,* 92 Cal. 388, [28 Pac. 485], it is said: ''The declarations of an agent or servant do not, in general, bind the principal.  To be admissible, they must be in the nature of original, and not of hearsay evidence.''  Conceding that Miss Brown, by rea-

son of what she had heard from others, believed Wilbur had drunk the solution of poison, the fact that she tried to suppress such information was no evidence of the fact involved (*Luman* v. *Golden Ancient Channel M. Co.*, 140 Cal. 700, [74 Pac. 307]; *Boone* v. *Oakland Transit Co.*, 139 Cal. 490. [73 Pac. 243].)

Defendants' objection interposed to the question asked of Mrs. Wilbur as to what, if any, property she had at the time of her son's death, was overruled, and she was permitted to testify that she had nothing. Counsel for plaintiff devote much space in their brief in an effort to sustain this ruling. In so doing they concede that the supreme court of this state has held directly against their contention. This being true, there could be no purpose in an extended discussion of the question as to whether or not the ruling constituted error. Suffice it to say, the supreme court has so decided; hence it is not an open question. Some of these cases are the following: "Considering a like question in *Mahoney* v. *San Francisco etc. Ry. Co.*, 110 Cal. 471, [42 Pac. 968], it was said: "It was, however, in my opinion, clear error to allow plaintiffs to prove that the children of the deceased had no means of their own. Such testimony could have been offered for no other purpose than to create prejudice, and should have been excluded." In *Green* v. *Southern Pacific Co.*, 122 Cal. 563, [55 Pac. 577], it is said: "Such evidence is never admissible in a case of this character, for the very simple reason that the extent of a defendant's responsibility for the results of his negligence is not to be measured by the condition as to affluence or poverty of the injured party at the time of suffering the injury, since that is a condition for which the defendant is in no way responsible." And in the very late case of *Story* v. *Green*, 164 Cal. 768, [Ann. Cas. 1914B, 961, 130 Pac. 870], it is said: "It has long been established that the plaintiff may not in such a case introduce proof of his poverty, because the damages are not in any manner dependent upon his financial condition."

In view of the conclusion reached, we deem it unnecessary to consider other alleged errors to which appellants direct attention.

The judgment and orders from which the appeals are prosecuted are reversed.

Conrey, P. J., and James, J., concurred.