PEOPLE *v.* McKERNAN.

1. HOMICIDE—CRIMINAL LAW—TRIAL — EVIDENCE FOR JURY — APPEAL AND ERROR.

In a prosecution for murder, the strangeness of the story of the homicide told by the people's principal witness, who claimed to have been present when the crime was committed, was for the jury rather than the Supreme Court, since the latter, in reviewing the judgment, does not hear the case anew upon the evidence.[1]

2. SAME—EVIDENCE—FIXING DATE. .

In a prosecution for murder, there was no error in permitting a witness to fix the date he saw defendant and knew by smelling his breath that he had been drinking, by the fact that he heard of defendant's arrest the next day.[2]

[1]Homicide, 30 C. J. §§ 570, 696 (Anno); [2]Evidence, 23 C. J. § 1777.

3. SAME—TESTIMONY THAT DEFENDANT HAD BEEN DRINKING ON
THE DAY THE OFFENSE WAS COMMITTED ADMISSIBLE.

There was no error in showing that witness noticed that
defendant had been drinking, where the occasion testi-
fied to was on the day of the killing and but a few minutes
before defendant, with deceased and another, started away
in the latter's automobile on the trip during which the
killing is claimed to have occurred.[3]

4. SAME—TRIAL—CROSS-EXAMINATION—APPEAL AND ERROR.

Although refusal to allow the people's principal witness,
on cross-examination, to tell his story of the killing from
the beginning, unless elicited by questions and answers,
cannot be said to be reversible error, said ruling is not
approved, especially in view of the fact that his story was
of a character calling for the utmost liberality in testing
his ability to restate it.[4]

5. APPEAL AND ERROR—CURTAILING CROSS-EXAMINATION NOT NECES-
SARILY ERROR—DISCRETION.

Error may not be planted upon mere want of liberality
in allowing cross-examination of witnesses, where no strict
right is curtailed and no abuse of discretion committed.[5]

6. HOMICIDE — CRIMINAL LAW — TRIAL — WANT OF LIBERALITY IN
CROSS-EXAMINATION NOT ERROR.

Witness, who testified that deceased was shot in his car,
should have been permitted, on cross-examination, to an-
swer the question as to whether or not he was interested
in knowing whether the man was dead, because his mental
attitude, as well as his acts, was a proper subject of in-
quiry, but refusal to permit the answer was a want of
liberality rather than reversible error.[6]

7. SAME.

Where a witness had stated that, at defendant's request,
he cleaned the revolver with which defendant did the
killing by drawing a handkerchief through its barrel, the
court might well have permitted the witness, at request
of defendant's counsel, to try to draw a handkerchief
through a revolver barrel of the same caliber, although
the handkerchief and revolver were not the ones claimed
to have been used, but refusal of the demonstration, which
probably had no bearing on the result, was not reversible

---

[3]Homicide, 30 C. J. § 454; [4]Witnesses, 40 Cyc. p. 2415; [5]Criminal
Law, 17 C. J. § 3658; [6]Witnesses, 40 Cyc. pp. 2489, 2492, 2513.

error, since, had it been tried, and the handkerchief not put through, it would not have been of decisive importance.[7]

8. SAME—EVIDENCE—EXPERT WITNESSES—TRIAL—CROSS-EXAMINATION.

Where an expert witness had testified that a test made by him of a stain on defendant's trousers showed, in his opinion and "by the best authorities," without naming them, that it was human blood, the trial court was right in not permitting defendant's counsel to read from the works of experts on the subject; witness not having referred to them, and counsel having failed to lay the proper foundation by asking him to name the authorities he had in mind.[8]

9. TRIAL—RIGHTFUL CROSS-EXAMINATION NOT DISCRETIONARY.

Rightful cross-examination is not within judicial discretion.[9]

10. HOMICIDE—CRIMINAL LAW—RIGHT TO CROSS-EXAMINE ON MATERIAL ISSUE—APPEAL AND ERROR.

Since the issue as to whether said stain was human blood was a material one, introduced by the prosecution, defendant's counsel had a right, on cross-examination, to fully question the accuracy of the test made, as well as witness' opinion, and to disclose his knowledge of the whole subject, and if the court's ruling curtailing the cross-examination in this respect was prejudicial, it calls for reversal.[10]

11. APPEAL AND ERROR—CRIMINAL LAW—MISCARRIAGE OF JUSTICE.

Where, in a criminal case, the ruling of the court on a material issue was prejudicial to defendant, his conviction is not saved by 3 Comp. Laws 1915, § 14565, providing that error shall not be cause for reversal unless it resulted in a miscarriage of justice.[11]

12. CRIMINAL LAW—TRIAL—EXPERT WITNESSES—RIGHT TO CROSS-EXAMINE—APPEAL AND ERROR.

That counsel might have sworn other expert witnesses and thereby shown what he expected to show by the cross-examination of the witness, does not excuse the curtailment of the cross-examination.[12]

[7]Criminal Law, 16 C. J. § 1221; 17 C. J. §§ 3584, 3679; [8]Id., 16 C. J. § 1555; [9]Witnesses, 40 Cyc. p. 2515; [10]Evidence, 22 C. J. § 813; [11]Criminal Law, 17 C. J. § 3751; [12]Evidence, 22 C. J. § 813.

13. HOMICIDE — EXCLUDING QUESTION ON CROSS-EXAMINATION ON
    MATERIAL ISSUE REVERSIBLE ERROR.

    In view of the fact that a test of the stain might show
    a specific protein, and yet not be decisive that it was
    human blood, the ruling of the trial court excluding, on
    cross-examination, a question as to whether witness'
    opinion that the stain was human blood rested upon the
    showing, in the test made, of a specific protein, which is
    one of the radicals of blood, was reversible error.[13]

Error to recorder's court of Detroit; Bartlett
(Charles L.), J. Submitted June 17, 1926. (Docket
No. 122.) Decided October 4, 1926.

John McKernan was convicted of murder in the first
degree, and sentenced to imprisonment for life in the
State prison at Marquette. Reversed.

  *Edward N. Barnard,* for appellant.

  *Andrew B. Dougherty,* Attorney General, *Robert M.
Toms,* Prosecuting Attorney, and *William D. Brusstar,*
Assistant Prosecuting Attorney, for the people.

WIEST, J. Under sentence for murder in the first
degree, defendant reviews his conviction by writ of
error, alleging 147 errors, but grouping them under
five heads. The jury found that defendant, while
riding in the automobile of Irving Hansen, shot and
killed Gavro Radulovich, an old man, also riding in
the automobile, and then, with the help of Hansen,
disposed of the body by dragging it into a marsh on
a country road. Defendant denied being with Hansen
in the country, and claimed that Hansen took him
home and he knew nothing about the murder. De-
fendant was a policeman in the city of Detroit, had
no previous acquaintance with Hansen, and first met
him about 7 o'clock in the morning of the day of the

[13]Criminal Law, 17 C. J. § 3658 (Anno) ; 13 L. R. A. (N. S.)
1024; 25 L. R. A. (N. S.) 376; 52 L. R. A. (N. S.) 230; 36
L. R. A. 470; 12 A. L. R. 869; 23 A. L. R. 438; 13 R. C. L. 715
*et seq.;* 3 R. C. L. Supp. 76; 4 R. C. L. Supp. 826; 5 R. C. L.
Supp. 705.

murder, when Hansen spoke to him about looking for a job.

Consideration of the legal points does not demand an extended statement of the evidence. It must be admitted that the claimed circumstances surrounding the commission of the crime and subsequent doings of the witness Hansen present a strange case of homicide by defendant, but this strangeness was before the jury, and we do not hear the case anew upon the evidence.

There was no error in permitting witness Grogg to fix the date he saw defendant and smelled his breath, by the fact he heard of his arrest the next day. Neither was there error in showing by this witness that he noticed defendant had been drinking, for this was on the day of the killing, and but a few minutes before defendant, Hansen, and the deceased started away in Hansen's automobile. Hansen testified to the killing by defendant, and upon cross-examination was asked to tell the story from the beginning. The prosecutor objected unless elicited by questions and answers. The court sustained the objection. It is insisted that the ruling constituted reversible error. We do not approve of the ruling, but cannot say it calls for reversal. His direct testimony was elicited by questions, and upon cross-examination counsel was permitted to fully probe the witness. The account of the killing given by Hansen was of a character calling for the utmost liberality in testing his ability to restate the same, but we cannot plant error upon mere want of liberality. No strict right of examination in this respect was curtailed and no abuse of discretion committed.

There is, however, a series of rulings sustaining objections of the prosecutor to questions asked Mr. Hansen, which, while not disclosing a miscarriage of justice, present a subject calling for comment. We discover no reason for refusing to permit Mr. Hansen to be asked if he was not interested in knowing whether

the man shot in his car was dead.   His mental atti-
tude and not his acts alone was a proper subject of
inquiry, and, while bordering on the line of argument,
was not exclusively such, and the trial judge might
well have permitted the inquiry.   But refusal of what
should have been, in liberality, permitted does not
warrant reversal, for the jury, from the acts detailed,
could draw every inference intimated in the questions,
if they cared to do so.   Many similar instances might
be mentioned where the court could have been more
liberal with commendable graciousness, but we do not
feel the strict rule followed occasioned a miscarriage
of justice.

After the killing, Hansen took defendant home and
at his request claimed he cleaned the revolver by
running a handkerchief through its barrel.   Counsel
for defendant was not permitted to have the witness
try to run a handkerchief through the barrel of a same
caliber revolver, the court stating it must be the re-
volver cleaned and handkerchief used on such occasion.
We are loath to believe that such ruling had any bear-
ing on the result reached by the jury, and must pass
it here with the observation that, while handkerchiefs
vary in size and texture, the character of all .38
caliber revolvers are likely, to say the least, to be
quite similar.   There would have been no harm in
permitting the demonstration by the witness, but had
it been tried, and a handkerchief employed not put
through, the demonstration would not have been of
any decisive importance.

Hansen testified that defendant's coat was laid over
the old man's body in the car and was blood-stained.
Stains on the coat were tested by an expert, who testi-
fied that, as a result of a "biological test," he did not
determine the composition of the stains, but a stain
on defendant's trousers indicated it was human blood.
On direct-examination the witness testified:

"My training and experience along the lines of

bacteriology and chemistry do not enable me to tell the composition of blood. I am able to discern from my experience and my study whether or not a stain on fabric is a blood stain. * * *

"With reference to these two places that are cut out (trousers), I cut those out and tested the stain on them for human blood. It was a biological test. I obtained a positive test for human blood. That indicates that the stain was human blood."

On cross-examination he gave the method employed in making the test (too long to be here inserted), and was asked:

"You make a salt solution out of that. You also make up another one by taking some kind of known serum, such as ox blood or anything of that kind? Make 85/100 per cent. salt solution out of that and put it in the test tube. Those are all treated in the same way, and these tubes are placed there? Then your test to determine whether or not you find the presence of anything, is not the presence of blood, but it is to determine whether there is a presence of protein; and a protein is a radical in the construction of blood. By a radical in the construction of blood, you necessarily mean that is one of the basic bodies; a protein is the basic body for food, isn't it?

"A. Yes, sir.

"Q. It is a basic body for sputum; if I spit; is it not?

"Mr. Baxter (prosecutor): This is all very interesting—

"The Court: Yes.

"Mr. Baxter: And educational. I submit, it is immaterial and beside the point.

"The Court: I agree with you.

"Mr. Barnard: If the court please,. I will show in this. case—

"The Court: Just a minute. Gentlemen of the jury, you may be excused.

"Mr. Barnard: By this examination— * * *

"Mr. Baxter: So your honor may understand my objection, I have no objection to any number of questions, so long as the particular test in question is adhered to. I do not believe this jury or the court is

interested in a long discussion as to what protein is, as to food or anything else, except as regards this blood and this test.   *   *   *

"*Mr. Barnard:* The situation is this:   This is the whole case.   This is your case—

"*The Court:* Just a minute.   You are going over a lot of things that are not related to the case in any way.

"*Mr. Barnard:* I will say to the court that this whole case—will you let me make a statement?

"*The Court:* I understand thoroughly.   It is not necessary to make a statement.

"*Mr. Barnard:* Will your honor let me make a statement on the test?   It is not a blood test, but a protein test.   I will offer to show that protein is not blood. That, when he is making the test, he is testing for protein, not for blood.   I have the latest authorities on my table that will show positively that a protein test does not show blood.

"*Mr. Baxter:* I have no objection if he sticks to it.

"*The Court:* You have not been doing that.

"*Mr. Barnard:* The question I asked—

"*The Court:* Gone over entirely different question.

"*Mr. Barnard:* The question I was asking at the time was this:   Whether or not a protein was the basic part of food.

"*The Court:* I am not going to argue with you.   I have made my ruling.   Bring in the jury.

"*Mr. Barnard:* Can we show what we started to show?   He says:   'I have no objection to that.'

"*The Court:* You can go that far, but when you continue with the exhibition of chemistry here, it is ridiculous."

Continuing the cross-examination, Mr. Barnard asked:

"*Q.* Mr. Lindsay, when you have determined that there is a reaction between these liquids that shows protein, you haven't necessarily determined that there is anything more than protein in these tubes, have you?

"*A.* Yes, sir."   *   *   *

On re-direct by Mr. Baxter:

"*Q.* I will ask you whether or not these tests that

you performed, in your opinion, show that the particular stain that you were testing was human blood, absolutely?   *   *   *

"*A.* It does, in my opinion, and I think by the best authorities is so considered."

By Mr. Barnard:

"*Q.* By your opinion, you mean it shows a specific protein, and that protein you know must be blood because it is one of the radicals of blood?

"*Mr. Baxter:* Just a minute.

"*The Court:* You need not answer that question."

The test employed by the witness was probably the precipitin serum test or at any rate one closely analogous thereto. The court was right in not permitting counsel to read from the works of experts on the subject, in contradiction or discredit of the witness, for it was not made to appear that the witness based his opinion upon such works 'and he had not referred to them as authority. *Marshall* v. *Brown,* 50 Mich. 148; *People* v. *Millard,* 53 Mich. 63, 75; *Hall* v. *Murdock,* 114 Mich. 233; *Foley* v. *Railway Co.,* 157 Mich. 67; *Sykes* v. *Village of Portland,* 193 Mich. 86. In stating the test showed the stain was human blood in his opinion and "I think by the best authorities is so considered," the witness unlocked the door of exclusion, but counsel failed to lift the latch by having him name the authorities he had in mind. The brief for the people is not helpful on the subject under discussion. All said therein is:

"Limiting defendant's counsel in his cross-examination of the witness Emerson Lindsay was not an abuse of discretion. It was on a matter not vitally material to the issue involved. It did not pertain to a theory of the defense. However prejudicial the ruling of the court might have been in this regard, such a holding did not amount to a miscarriage of justice."

Rightful cross-examination is not within judicial discretion. Whether the stain on the trousers was

human blood was a material issue introduced by the prosecution in corroboration of the testimony given by Hansen. Such issue did not have "to pertain to a theory of the defense," to carry right to fully question the accuracy of the test made by the expert, as well as his opinion, and to disclose his knowledge of the whole subject. If the ruling was prejudicial to the rights of defendant, we must say that it calls for reversal.

The statute (3 Comp. Laws 1915, § 14565), inferentially invoked, does not save conviction, "however prejudicial the ruling of the court might have been." The expert having given the opinion based on a scientific test employed by him that a stain on defendant's trousers was human blood, counsel for defendant had a right to have him say whether or not his opinion rested upon the showing in the test of a specific protein, and the court erred in holding he need not answer. Of course, his deduction could have been questioned by other expert witnesses, but this right excuses no curtailment of questions calling for disclosure of the knowledge possessed by the witness in hand.

Witthaus & Becker, in the 2d edition of their work on Medical Jurisprudence, Forensic Medicine and Toxicology (vol. 3), pp. 876, 877, in speaking of the precipitin serum test, say:

"Without the rigid employment of certain control tests the results of the serum method are valueless for medico-legal purposes. *  *  *

"Since any albumen from the human body may respond to humanized serum, it must first be determined by the hæmin or spectroscopic tests that the material is blood."

And on page 882:

"Since the principles of the test are well founded, the certainty of its results must depend on the skill and experience of the operator. At present the technical details and the sources of error have not

been sufficiently studied to warrant exclusive reliance on this test, or the recommendation of its use outside the experimental laboratory."

We quote the latter part, not in condemnation of the test, but to show the advisability of permitting a searching examination of the method employed, skill exercised, and care taken in elimination of possible erroneous conclusions.

We find no evidence of a microscopic test showing the stain was blood. The witness having said that the stain was human blood, it was reversible error to exclude the vital question: "By your opinion you mean it shows a specific protein, and that protein you know must be blood because it is one of the radicals of blood?"

In Legal Medicine and Toxicology by Peterson, Haines and Webster (2d Ed. 1923), vol. 2, p. 933, it is stated:

"The first question to decide is whether the suspicious spots and stains consist of blood, and for this purpose we have the chemical, microscopic and spectroscopic methods which have been described. It is necessary to determine whether spots and stains are made by blood, not only because blood may be simulated by paint, fruit juices, and in other ways, but also because spots and stains made by protein materials other than blood may react in the same way as blood to the precipitin test. For instance, antihuman serum alone will not distinguish spots by human blood from spots by other human protein-containing material such as albuminous urine, purulent sputum, exudates, and transudates. All the antihuman serum can tell us is that the spots are made by human protein, and whether they are made by blood must be determined by the general tests for blood."

For the error pointed out the conviction is reversed, a new trial granted, and defendant remanded to await trial.

Bird, C. J., and Sharpe, Snow, Steere, Fellows, Clark, and McDonald, JJ., concurred.